whenever you're ready. Thank you, Your Honor. Good morning. May it please the court. In Hines v. Barhart, this court noted that it has been battling the commissioner for many years on how to evaluate complaints of pain. And this case is yet another instance where the commissioner refused to heed this court's warning that spanned decades and relied on and demanded that Ms. Lewis produce objective evidence of not just the pain itself but of the intensity of that pain. And although this case is fairly fact-intensive, the central legal issue is fairly simple. It's whether the commissioner followed correct legal standard for evaluating testimony of Ms. Lewis and her physicians. And the answer to it, it has not. And the commissioner's decision should be reversed for at least three reasons, because first, contrary to this court's precedent, its own regulations and decisions of this court's sister courts required that Ms. Lewis provide the subjective evidence. It's erroneous when, contrary to its own rules, discounted testimony of treating physicians and ultimately improperly played doctor in evaluating the nature of Ms. Lewis's treatment. Now, before going to the heart of the argument, I think it's important to note what the parties actually agree on. The parties actually agree that Ms. Lewis suffers from severe ailments such as obesity, degenerative disc disease, thoracic outlet syndrome, diabetes, lupus, and the others. Parties further agree that Ms. Lewis's condition can be reasonably expected to cause her symptoms, and this is supported by the government's physician evaluations by Dr. Serpik and Dr. Sadler. Parties also agree that Ms. Lewis is unable to perform past work as found by the commissioner, by the ALJ at AR 29. And finally, parties agree that if Ms. Lewis's complaints were to be believed, she would be found disabled as there would be no jobs available for her as testified by the vocational expert at AR 64. And so not her past additional work. In other words, is she, does she in fact suffer from the intensity of the pain that she claims, and does that pain preclude her from working? But the way this works out is that once the parties agree on those first four issues, the burden to show that there are in fact jobs in the national economy that Ms. Lewis could perform is not no longer on Ms. Lewis, it's now on the government. And the government simply failed to carry that burden. The government must show that Ms. Lewis doesn't suffer from as much pain as she alleges. The government relies on three arguments in support of this position, and they say that there's lack of objective medical findings, that she's able to do household chores, and that the type of medical treatment she received is conservative, as opposed to sufficiently intense to make her claims believable. And each of those arguments is simply wrong, either as a matter of science or as a matter of the record. And ultimately the Commissioner's approach is contrary to law and is not supported by substantial evidence. First, this Court and its other sister circuits have long rejected the requirements that the intensity of the pain must be corroborated by substantial evidence. And that's in Hines v. Barher in 2006, in Hyde v. Sullivan in 1990, and going past a number of decades. In fact, Commissioner's own regulations prohibit a rejection of substantive testimony simply because of absence of objective findings. And this makes perfect sense from a medical viewpoint, because the very nature of chronic pain often precludes the presence of objective evidence. Because chronic pain, unlike peripheral pain, is the pain where the locus is not actually in a distant joint or a limb or somewhere inside the body. Instead, chronic pain is the pain that central nervous system, because central nervous system improperly processes sensory stimuli, to the rest of us would be normal, but to an afflicted person would cause intense pain. And in fact, Commissioner's own regulations, for example, with respect to RSD, Reflex Sympathetic Dystrophy Syndrome, recognize that in individuals suffering from that syndrome, the pain by definition is out of proportion to any physical symptoms or findings beyond the pain. And it's this failure to appreciate the basic medical facts shows that the judgment below is not supported by substantial evidence. Now, the ALJ found that she was not entirely credible. Correct. And then in making that statement, he seems to make some statements that are not factually accurate. He says that the record reflects that Lewis recovered from her surgeries without incident. Correct. So, my question to you is, to what extent is the ALJ's observation about credibility linked to, because ordinarily we give tremendous weight to that. So, is that undermined by the fact that he's reciting facts that are not supported by the record? Yes, it is, Judge Kinnan, but it actually goes deeper than that. I think the Court is absolutely right to give tremendous weight to the ALJ credibility, who after all saw the claimants, saw them testify, and so on. Except that, in this case, it's not just that the ALJ relied on incorrect factual determinations. It's that this credibility determination is supported by absolutely nothing. The only thing that ALJ cites to undermine Ms. Lewis's credibility are these, once again, these three factors, that she can do household chores, that there's no objective medical findings, and that her treatment is conservative. But all of those things are actually wrong. Well, he cites the evidence from the doctors before she developed lupus, right? Right. The two doctors who last saw her before the lupus diagnosis? Yes. Now, how do we look at that? Well, so, again, so I He just had a major diagnosis. Does that make a difference? Because we need you to tell us Sure. And so that goes to the issue of why didn't the ALJ credit their treating physicians, as is required by regulations, unless inconsistent with the rest of the testimony. And so Well, he credited them. He just didn't give them much credit. Exactly. But he's allowed to give them he's required to give them controlling weight, unless inconsistent with the rest of the medical evidence. And there's, again, no inconsistency at all. For example, Dr. Mahmoud, who is an internist and has been treating Ms. Lewis for about four years, said that she experienced pain at least at a seven out of ten scale. Dr. Jacob, a rheumatologist, who's been seeing Ms. Lewis for over a year, said the same thing and testified that she will experience severe pain for the rest of her life. Dr. Shuba, again, a neurologist and pain specialist at Johns Hopkins, stated that Ms. Lewis has, quote, significant, persistent and very debilitating pain in her neck and upper extremity. And that's at AR 565 and 604. As I understand the record, I'm looking at page 29 of the appendix in the ALJ's opinion, when the ALJ responds and says, you know, I'm in this case, I'm not giving the treating physicians, I'm only giving them partial weight, it goes back to the same three items that show up. Longitudinal conservative treatment record, whatever that is. Clinical and examination findings and Ms. Lewis's ongoing capabilities, which I think you've already referred to, watching TV and that sort of stuff. So, am I correct in the record that the only reason that the treating physicians did not receive the weight that would appear to be required by the regulations are those three items? That is my position. I suppose that question is better directed to the opposing counsel. But I don't see anything else out there that would support that finding. And even those three things that you just listed, Judge Agee, they don't support the finding. So this idea of longitudinal conservative treatment record, I don't understand how can this possibly be conservative when Ms. Lewis is on at least four pain medications, each of which is orders of magnitude more powerful than morphine. How can this be a conservative treatment record once she went through surgery that required a rib resection? How can it be a conservative treatment record once she had invasive nerve blocks and radial ablation of her nerves? I don't understand what would be the radical treatment record if not this. And the ALJ never says why it's conservative? No. And so in their response brief, the government says, well, it's not surgical. Well, first of all, there was surgery, both with the actual scalpel and with radial ablation. But of course not every ailment is amenable to surgical intervention. The definition, the medical definition of conservative versus radical is one versus gradual that has minimal intervention versus one that has kind of you do the maximum possible. I'm not quite sure what more once a person is on Dilaudid, fentanyl, oxycodone, and pain is still not controlled, and all the doctors say that she's fully credible, including government's own physicians found her during examination to be fully credible. And in fact, all the government's physicians said that her symptoms, including its severity, can be fully explained by objective medical evidence. I'm not quite sure what more, what kind of additional treatment would be no longer be conservative. And in my last couple of minutes, I do want to sort of point out, as Judge Asha alluded, to this idea of ongoing abilities. Beyond the fact that Ms. Lewis does household chores, including driving her son for less than 30 miles a day, cooks basic meals, there is no indication that she can do much. And as this Court has noted a number of times, the ability to do household chores at your own time, at your own leisure, including taking time off when you don't feel particularly well, and having your, in this case, her domestic partner do the rest, is not the same as working where you have to do your tasks or be fired. And no court that I found, either in this circuit or any other circuit, has said that the ability to do simple household chores, such as cook meals or perhaps pick up trash in the backyard or things like that, is sufficient to show ongoing capability of actually maintaining employment in the national economy. So all of these considerations that are either inappropriate or simply don't support, don't provide sufficient weight to the ALJ's finding. One last point that I would like to address is that in its brief, the government argued that the entire issue of our RSD diagnosis has been waived. And I would like to just reiterate our point that we are not arguing that RSD should be considered as a separate diagnosis. But it once again provides additional support, additional weight to credit as opposed to discreditedness. And you're saying ALJ just failed to address it? ALJ just didn't even mention it. Even though, once again, government's own physicians diagnosed her with RSD. Those letters, those words are completely absent from ALJ's opinion. That alone makes the opinion not supported with substantial evidence and subject to reversal. So the bottom line is that it is our viewpoint that, given the fact that government had the burden to show that there are jobs available in the national economy, and that the government agrees that if Ms. Liu suffers from the same amount of pain that she alleges, government simply failed to carry this burden at step five of the sequential analysis. Unless there's any further questions, I would like to reserve the balance of my time. Okay. Thank you very much. Thank you. Mr. Hensley. Good morning, Your Honors. Mr. Hensley, maybe you could start by telling us how this is conservative treatment by any point of view. Surgeries, high-grade opioids, how is this conservative? Well, I think everything is relative, Your Honor. The conservative treatment that the ALJ was referring to was the surgeries that had occurred early on in the claimant's allegations of disability. She had recovered. In March 2011, she underwent decompression of the left ulnar nerve at the cubital tunnel. Follow-up notes stated an uneventful recovery and some MRI of the left shoulder, which Ms. Lewis herself concedes is her main, 100 percent her main centering problem. An MRI revealed no evidence of ongoing problems around the nerves and no abnormalities of the nerves and cells. Right, but the MRI doesn't measure pain. Right. I would like to address the allegation of reflex sympathetic dystrophy and the chronic pain, if I may. And actually, Your Honors, if I may, I'd like to begin with actually two points. Ms. Lewis goes to great lengths to criticize the ALJ for not addressing Ms. Lewis' reflex sympathetic dystrophy. However, I would remind the Court, consistent with the agency policy, the ALJ clearly is not required to address an allegation that does not amount to a medically determinable impairment. Another point that I would like to raise, step two of the sequential evaluation process, Your Honors, is a threshold step. It requires a showing that a claimant has at least one severe impairment or a combination of impairments that's severe. But once that showing is made, the evaluation proceeds to the next steps in which the claimant must prove either that her impairments are medically so severe to be presumptively disabling or in the alternative that the impairments preclude her from performing prior work or other work. If I may provide an example, hypothetically, say you have a claimant with a severe visual impairment and the ALJ unfortunately misses this at step two. If the ALJ proceeds to discuss the evidence and appropriately incorporates limitations pertaining to, say, visual acuity in the RFC, the decision is supported by substantial evidence and should be upheld. Now in this case, the ALJ discussed all the relevant evidence. Yeah, but he made the Mascio error again, flipping the credibility determination, finding her less credible to the extent that it was inconsistent with her residual functional capacity. So why alone isn't that a problem with this case? I think the wording was unfortunate, Your Honor, but if you Well, it was erroneous under our decision in Mascio. We said you can't do that. You've got to determine credibility first. Yes, but if you read the decision in its entirety, the ALJ thoroughly discussed all of the evidence, discussed all of the factors that are required under 96-7P, and no one sole factor determined either the credibility analysis or the RFC. What about the fact that the ALJ didn't seem to really address the lupus diagnosis? You know, the ALJ was finding assertional limitations based on the two doctors, February 2011 and March 2012. These numbers, it seems to me, would have to be addressed after her diagnosis of lupus in 2012. It just seemed like the ALJ did an incomplete job in addition to the Mascio error, and why shouldn't we send this back? I mean, I understand the huge deference that goes to the ALJ, and properly so, but it just seems to me where you've got the Mascio error, where he didn't address the lupus, where he's relying on these older doctor's reports. He calls conservative treatment when she's on pretty high opioids, not getting relief from pain, she's having surgeries. Why doesn't this suggest the need for, that maybe the ALJ didn't do the job? Your Honor, respectfully, the lupus was considered by the ALJ at transcript 27. There's discussion of her treatment for lupus. He acknowledged... But he didn't discuss it in terms of the exertional limitations, did he? I would also point out that the testimony... Well, no, answer that question. He didn't address the lupus diagnosis in terms of the limitations. He did address Dr. Jacobs' opinion, and gave appropriate reasons for according that partial weight. But I would point out, Your Honor, if I may, that the testimony at the hearing by Ms. Lewis was that that condition fortunately was in remission, and had been for one year at the time of her hearing. And that was the appropriate time for... Under the regulations, the ALJ is required to give controlling weight to the treating physician, so long as the opinion is well supported. And as I read through the ALJ's opinion, you've got some fairly specific evidence offered by Dr. Mahmoud and Dr. Jacobs as to pain. And as I'm reading, and I'm reading again from page 29 of the appendix, the ALJ doesn't give controlling weight under the regulations, but only partial weight because of longitudinal conservative treatment record first. But simply citing that phrase, he never explains that I can see why that negates the treating physician's pain diagnosis. Can you explain that? I don't believe the ALJ disregarded the pain diagnosis. The ALJ considered... He only gave it partial weight, and he says, I'm giving it partial weight because of this undefined longitudinal conservative treatment record. Where does he ever say, here's what this longitudinal conservative treatment record is, and here's why what's in that record causes me to discount the treating physician's pain evidence? The longitudinal treatment record is detailed following the recitation of the RFC for three or four pages of detailed description of the medical evidence in the case. The medical evidence repeatedly shows, and again, this is just one factor, but it repeatedly shows... Where does he say, here's item one, two, and three, and these are what caused me to not give the weight the regulations require to the evidence of the treating physicians? He doesn't recite one, two, and three, but if you look through the record, you can see where he discusses the medical evidence, the medications that Ms. Lewis was taking, and the side effects. Right, but in terms of pain and following that regulation, though, as to treating physicians, doesn't he have to explain why he reduces the weight accorded that evidence? I believe the record in its entirety does support that. We don't have to go hunting through there like for a needle in a haystack. It seems like to me that ALJ's got to do that. If we assume that he didn't do that on the conservative treatment record, he gives two other reasons, one of which is her ongoing capabilities. He recites the ongoing capabilities to be watching television, writing her own checks, going to the grocery store with her mother, and I'm lost as to see how that relates to a diagnosis of pain. I guess our position, Your Honor, is... The absence of pain. Right. Our position is that before we even get to that, there has to be a showing of a medically determinable impairment, something that is established by clinical signs, symptoms, et cetera. Now, the RSD that Ms. Lewis heavily relies on in both of her briefs, I would point out, Your Honors, there are three page references in a 950-some page record that even refer to RSD at all, and the three pages are in Ms. Lewis's own disability report at Transcript 184, and this is just Ms. Lewis's completion of a report in which she says RSD is one of her disabling impairments. The other two are from consultative one-time examiners, one of whom was a psychologist, and just simply at Axis 3 of Dr. Miller's report simply lists RSD as one of the diagnoses. Clearly, Dr. Miller did not diagnose Ms. Lewis with RSD. He's a psychologist, and he saw her on one occasion. The final one is Transcript page 569. Another consultative physician, Dr. Merched, at the end of his report lists a number of impairments under impression. Near the end of that list, Dr. Merched mentions possible reflex sympathetic dystrophy. More to the point, the only other reference in the entire transcript of record to RSD or to chronic regional pain syndrome is, this is from an actual treating source, at Transcript page 326 to 327, on October 13, 2009, a treating source said Ms. Lewis, quote, does not have any concrete sign of CRPS, which is complex regional pain syndrome. What does this tell us, Your Honors? Respectfully, it tells us there clearly are concrete signs of this condition, and Ms. Lewis did not have them. She cannot establish that she had this. Now, chronic pain, she testified to this. She also testified to her anemia, which was in remission, fortunately, at the time of the hearing. She testified to her carpal tunnel syndrome, diabetes, her anemia. She also mentioned her thoracic outlet syndrome and, in fact, emphasized that this was her, quote, big problem. It continues to be the thoracic outlet syndrome. She testified concerning some issues with anxiety and depression. She, of course, did testify about her pain, and the LJ acknowledged this testimony, but she did not, interestingly, offer any mention whatsoever of reflex sympathetic dystrophy. Now, SSA has a ruling that's devoted to RSD, 032P, and in this ruling, SSA explains that there are certain clinically documented signs in the affected region that can establish the presence of reflex sympathetic dystrophy. These are swelling, autonomic instability, which is like goose flesh, abnormal hair or nail growth, osteoporosis, or involuntary movements of the affected region. Now, in her brief, Ms. Lewis attempts to match these guidelines to her case without the benefit of medical support by citing to the presence of a, quote, precipitating injury and to Ms. Lewis's own complaints of stabbing, burning, throbbing, tingling pain. With this, Ms. Lewis claims that her symptoms matched the commissioner's own description of RSD, quote, almost verbatim. But other than evidence of tremors, Ms. Lewis meets none of the criteria that's actually set forth in SSR 032P. In fact, the evidence overwhelmingly shows no evidence of swelling, autonomic instability, abnormal hair or nail growth, or osteoporosis. Your Honors, yes, Judge Kennedy. Sorry to interrupt. But you know what keeps nagging me in this case is the Massey-Awerer because so much of this complaint revolves around pain. I mean, that's the essence of this, this alleged disability. And in a situation such as this where the ALJ improperly discounts her credibility based on her residual functional capacity, normal muscle strength, range of motion, sensation, and reflexes, how can we say that this is harmless, even if we grant you most of what you said? Why isn't this a problem when pain is the guts of this and he used the wrong measurement to evaluate her credibility? And credibility is so central to whether you can make a case of pain or not. It is. And I would agree with that, Judge. But I would point out that — I would point to Thomas v. Celebrezzi, which says that a reviewing court's duty is to scrutinize the record as a whole to determine whether the conclusions reached are rational. Now, if the ALJ appears to have put the cart before the horse, I think reading this decision, the four corners of the ALJ's decision in its entirety dispels that notion. There was a thorough analysis. Ms. Lewis does not claim that anything was left out of the RFC that should have been in there. She's not arguing that the RFC should have been more restrictive. So how could that have been harmful if everything that's in that RFC is in there? He accommodated that her pain is centered, and this is in the reply brief, it's centered in the left shoulder and the left arm. This was accommodated in the RFC very thoroughly. The ALJ limited her ability to lift with that non-dominant left upper extremity. He limited her ability to push and pull. He absolutely precluded her from overhead work with that left arm. He limited her reaching ability with the left arm. And finally, limited her fine and gross dexterity with the left upper extremity. Now, again, if it appears that he mistakenly put the cart before the horse, if you read the decision in its entirety, it's a thorough evaluation of the evidence. What evidence in the record supports his finding that she only needed to be off task 5 percent at the time as opposed to 10 percent? Where's the evidence on that? I believe that her own, I believe her own disability report dispelled that notion. He pointed out... Do you have evidence of 5 percent off task? I didn't see it. Could you point to one? Not that specific figure, no. So he, the ALJ, just came up with that, then? I, yeah, I don't have a response to that. Sort of made it up, or didn't like their 10 percent, the 10 percent evaluation, so just thought, well, cut it in half? I think it was a reasonable, a reasonable finding based on the record. There's no evidence to support 5 percent. I guess the response to that, Your Honor, would be that the burden is on the, on Ms. Lewis at that point to establish that the RFC is mistaken. She offers no, no evidence to rebut the 5 percent. Well, there still has to be evidence to support it, doesn't there? I think it could have been zero. I think the ALJ was giving her the benefit of the doubt. There was evidence that she did not suffer from concentration deficits as well. So, in conclusion, Your Honors, Social Security's position is that in this case, it appears to us that Ms. Lewis would have this Court hold a dangerous precedent, that it's sufficient for a claimant simply to allege chronic pain without the presence of any medically determinable impairment, and the Commissioner with that is simply compelled to accept that claim at face value and pay benefits. Again, I would emphasize that would be a very dangerous precedent with wide-ranging effect, and we urge the Court not to go in that direction. Thank you very much. Thank you. Mr. Dolan, you have some rebuttal time. Thank you very much, Your Honor. Let me just address maybe two or three points, and let not argue that mere allegation of pain means the Commissioner has to throw up its hands and just start awarding money. The government is just wrong that there is not medically determinable evidence. In fact, the ALJ found that there is medically determinable evidence that would cause pain, and that is at AR 25. The ALJ concludes that Ms. Lewis' symptoms, which she starts listing at AR 20, are of the type that are expected or could be consistent with the amount of pain that she experiences. So that, you know, she did have to prove the existence of medical diagnosis at Step 2, which she did, and the ALJ so found. And then eventually the question is, is the volume of pain, is the intensity, creditable? Second, once again, the government is simply wrong that RSD symptoms do not match Ms. Lewis' testimony. So, for example, the government just talked about how Ms. Lewis has no autonomic instability. Well, at AR 49, a testimony Ms. Lewis says, quote, throughout the day, yes, meaning to her apartment, goes cold, numb. Going cold is autonomic instability. Going numb is your goosebumps. That is verbatim the commissioner's own RSD diagnosis. Now in Judge Sheenan's question, where did the ALJ get its 5% number, and whether it's supporting the evidence? Well, it's not, except that the 10% or above number is supporting the evidence. Dr. McMoon and Dr. Jacob, in their report to the commissioner, said that she'll have to miss at least three days' worth of work. So she has evidence, and they did just make it up. And then finally, I would like to point out again, so commissioner's misunderstanding, government's misunderstanding of what it means, both miss citing the record and what it means to have uneventful recovery. So first off, the surgeries, although certain surgeries have occurred early on, Ms. Lewis did have nerve blocks after her surgery. So even though her rib was resected, even though Dr. Kerr said this might provide you some relief, she still had to go through two separate nerve blocks. And finally, this idea that everything's just fine. You can have a surgery and recover normally from it. It doesn't mean the problem is solved. Those are two completely separate issues. And ultimately, the government simply has this mishmash of ideas, none of which either independently or together support an ALJ conclusion. And ultimately, we believe it ought to be reversed. And final point with respect to Judge Sheenan's question to the opposing counsel, whether this should be sent back to the ALJ, we believe that the record speaks for itself to the point where it should be reversed with instructions. But of course, if the court believes that it would benefit from a second go around in front of the ALJ, we'll happily take that as well, unless there's any further questions. Thank you so much.
judges: G. Steven Agee, Barbara Milano Keenan, Stephanie D. Thacker